

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

SEP 18 2019

David J. Bradley, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| v. | § Criminal No. __19 CR 693__ |
| | § |
| LEONARD CARR, | § |
| | § |
| Defendant. | § |

### INFORMATION

The United States Attorney for the Southern District of Texas charges:

### General Allegations

At all times material to this Information, unless otherwise specified:

### Compounded Drugs

1.  Compounded pharmaceuticals were drugs that were combined, mixed, or altered from other drugs by licensed pharmacists or other licensed practitioners, pursuant to valid prescriptions issued by licensed medical professionals, including physicians, physician assistants, and nurse practitioners ("prescribers"), to meet the specific needs of individual patients.

2.  Although the individual ingredients in compounded medications were generally approved by the United States Food and Drug Administration ("FDA"), the compounded form of those medications were not. That is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.

### Commercial Insurance Plans

3.  Commercial insurance companies, employers, and private entities offered drug plans, which were also administered and operated by Pharmacy Benefit Managers ("PBMs"). A PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join

the plan's network.

4. A beneficiary in a privately insured drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

5. A pharmacy could participate in a privately insured drug plan by entering into an agreement with one or more PBMs acting on behalf of a privately insured plan. When a privately insured beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim to a PBM that represented that beneficiary's privately insured drug plan. The plan or PBM then adjudicated the claim, that is, determined whether the pharmacy was entitled to payment for each claim. If the pharmacy was entitled to payment, the PBM then reimbursed the pharmacy. The drug plan's sponsor, in turn, reimbursed the PBM for its payment to the pharmacy made on behalf of that drug plan.

6. Express Scripts, Inc. ("ESI"); Argus; Caremark LLC, doing business as ("d/b/a") CVS/Caremark ("CVS/Caremark"); Optum RX, Inc.; Catamaran; and Prime Therapeutics, LLC, among others, were PBMs, and were health care benefit programs, as defined by Title 18, United States Code, Section 24(b), that affected commerce.

### The Medicare Program

7. The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, including to individuals who were 65 years or older or disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

8. Medicare programs covering different types of benefits were separated into different program "parts." Part D of Medicare (the "Medicare Part D Program" or "Part D") subsidized the costs of prescription drugs for Medicare beneficiaries in the United States. The Medicare Part D Program was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006.

9. To receive Part D benefits, a beneficiary enrolled in a Medicare drug plan. Medicare drug plans were operated by private companies that Medicare approved, often referred to as drug plan "sponsors." A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

10. A pharmacy could participate in Part D by entering a retail network agreement directly with a plan or with one or more PBM. A PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join the plan's network. When a Part D beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim either directly to the plan or to a PBM that represented the beneficiary's Medicare drug plan. The plan or PBM determined whether the pharmacy was entitled to payment for each claim and periodically paid the pharmacy for outstanding claims. The drug plan's sponsor reimbursed the PBM for its payments to the pharmacy.

11. Medicare, through CMS, compensated the Medicare drug plan sponsors. Medicare paid the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans. Such payments were called capitation fees. The capitation fee was adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases in which a sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, Medicare reimbursed the sponsor for a portion of those additional expenses.

3

12.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that affected commerce.

13.     PBMs ESI and CVS/Caremark, among others, were Medicare drug plan sponsors.

### The TRICARE Program

14.     TRICARE was a health care program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors. Individuals who received health care benefits through TRICARE were referred to as TRICARE "beneficiaries." The Defense Health Agency ("DHA"), an agency of the DOD, was the military entity responsible for overseeing and administering the TRICARE program.

15.     TRICARE provided coverage for certain prescription drugs, including certain compounded drugs that were medically necessary and prescribed by a licensed medical professional. PBM ESI administered TRICARE's prescription drug benefits.

16.     In or around May 2015, the DHA implemented a new screening procedure to ensure that TRICARE-covered compounded drugs were safe, clinically necessary, and cost effective, which resulted in a steep decline in TRICARE's reimbursements for compounded drugs.

17.     TRICARE beneficiaries could fill their prescriptions through military pharmacies, TRICARE's home delivery program, network pharmacies, and non-network pharmacies. If a beneficiary chose a network pharmacy, the pharmacy would collect any applicable copay from the beneficiary, dispense the drug to the beneficiary, and submit a claim for reimbursement to ESI, which would, in turn, adjudicate the claim and reimburse the pharmacy directly or through a Pharmacy Services Administrative Organization ("PSAO"). To become a network pharmacy, a

pharmacy agreed to be bound by, and comply with, all applicable State and Federal laws, specifically including those addressing fraud, waste, and abuse.

18. TRICARE was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that affected commerce.

### The Defendant, Coconspirators, and Entities

19. Defendant **LEONARD CARR**, a resident of Houston, Texas, was the Vice President of Operations at Pharms, LLC ("Pharms"), a management company formed in or around 2013. **LEONARD CARR** was the part-owner of Pharms, several pharmacies, and another business entity located in or around Houston, Texas, within the Southern District of Texas.

20. Owner 1 ("Owner 1"), a resident of Dallas, Texas, owned or controlled Pharms and several licensed pharmacies and other business entities in or around Houston, Texas, within the Southern District of Texas.

21. Owner 2 ("Owner 2"), a resident of Houston, Texas, owned or controlled Pharms and several licensed pharmacies and other business entities in or around Houston, Texas, within the Southern District of Texas.

22. Physician 1 ("Physician 1"), a resident of Houston, Texas, was a physician licensed to practice medicine in the State of Texas. Physician 1, along with Owner 1 and others, owned or controlled several licensed pharmacies and other business entities in or around Houston, Texas, within the Southern District of Texas.

23. OmniPlus Health Care, L.P.; Alternative Medicine and Pharmacy, Inc., d/b/a OmniPlus Pharmacy; Omni-One-Med Pharmacy Services, LLC; Safety and Health Technology, LLC, d/b/a Accu-Care Pharmacy; Kremco Pharmacy, LLC d/b/a Kremco Pharmacy; Healthy Pharmacy Solutions, Inc.; and JSW Prosperity, LLC, d/b/a 1 Stop Pharmacy (collectively "the

Pharmacies") were pharmacies located in and around Houston, Texas, that dispensed compounded drugs, "kits," "patches," and other pharmaceuticals.

## COUNT ONE
### Conspiracy to Commit Healthcare Fraud and Pay and Receive Kickbacks
### (18 U.S.C. § 371)

24.     The allegations in paragraphs 1 through 22 of this Information are realleged and incorporated by reference as though fully set forth herein.

25.     Beginning in or around 2014 and continuing through in or around 2017, the exact dates being unknown, in the Houston Division of the Southern District of Texas and elsewhere, the defendant,

### LEONARD CARR

did knowingly and willfully combine, conspire, confederate, and agree with Owner 1, Owner 2, Physician 1, and others, known and unknown:

   a.     to violate Title 18, United States Code, Section 1347, that is, to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), including Medicare, TRICARE, and other government and commercial health care benefit programs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

   b.     to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and

6

bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a federal health care program, that is, Medicare and TRICARE; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item and service for which payment may be made in whole and in part by a federal health care program, that is, Medicare, TRICARE, and Workers' Compensation; and

  c. to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a federal health care program, that is, Medicare and TRICARE; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a federal health care program, that is, Medicare, TRICARE, or Workers' Compensation.

### Purpose of the Conspiracy

26. It was a purpose of the conspiracy for the defendant **LEONARD CARR** and his coconspirators to unlawfully enrich themselves by, among other things: (1) submitting and causing to be submitted false and fraudulent claims to Medicare, TRICARE, and other government and commercial health care benefit programs; (2) concealing the submission of false and fraudulent claims to Medicare, TRICARE, and other government and commercial health care benefit programs; (3) diverting the proceeds of the fraud for their personal use and benefit, and the

personal use and benefit of their coconspirators, in the form of compensation, commission payments, and other remuneration; and (4) paying and receiving kickbacks and bribes in exchange for the referral of beneficiaries for whom the Pharmacies submitted claims to Medicare, TRICARE, and Workers' Compensation through the PBMs.

### Manner and Means of the Conspiracy

27. The manner and means by which the defendant **LEONARD CARR** and his coconspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

28. Beginning at least by in or around 2013, Owner 1, Owner 2, Physician 1, and others founded, owned, and operated Pharms, LLC ("Pharms"), a management company; the Pharmacies; and Rx Logistics, LLC, all located in and around Houston, Texas within the Southern District of Texas. The Pharmacies contracted with several PBMs to file claims for reimbursement for compounded and other drugs.

29. The Pharmacies formulated and mixed compounded drugs, "kits," and "patches" not based on individualized patient need, but instead on formulas designed to maximize reimbursements from government and commercial health care benefit programs.

30. **LEONARD CARR** was hired in or around May 2014, and became Pharms's Vice President of Operations in or around October 2014. In or around January 2015, **LEONARD CARR** became a part-owner of Pharms, some of the Pharmacies, and Rx Logistics, LLC.

31. To increase reimbursements, Owner 1 oversaw a national network of hundreds of Sales Representatives who were financially incentivized to refer high volumes of prescriptions—some of which were written for themselves and their families—through commissions and illegal

kickbacks that were based on reimbursements from health care benefit programs—including Medicare, TRICARE, and other government and commercial health care benefit programs—to the Pharmacies for expensive compounded and prescription drugs.

32. Beginning in 2014, **LEONARD CARR** began overseeing commission payments, some of which were in violation of the Anti-Kickback Statute. **LEONARD CARR** also knew that many Sales Representatives were paid commissions on prescriptions fraudulently written for themselves and their families.

33. To further increase insurance reimbursements paid to the Pharmacies, Owner 1, Owner 2, and others, including Sales Representatives, often directed prescribers, including Physician 1, to sign off on prescriptions for patients the prescribers had never seen or treated.

34. Some of those prescribers were further financially incentivized to invest in one of the Pharmacies in exchange for "returns" on those investments. **LEONARD CARR** knew that many of these "returns" were inducements to write prescriptions.

35. The Pharmacies often waived copayments, even though Medicare, TRICARE, and other government and commercial health care benefit programs required the Pharmacies to collect copayments.

36. Once filled, the Pharmacies often mailed the compounded and other drugs to individuals who resided in states in which the Pharmacies or the prescribers were not properly licensed. The Pharmacies evaded detection by employing fraudulent shipping practices.

37. The PBMs occasionally audited or investigated the Pharmacies, the prescribers, and the patients who had purportedly been prescribed these expensive compounded drugs, "kits," "patches," or other drugs. **LEONARD CARR**, Owner 1, Owner, 2, Physician 1, and others conspired to provide false information to the PBMs in response to these audits and investigations.

38. When a PBM terminated one of the Pharmacies, **LEONARD CARR**, Owner 1, Owner 2, and others conspired to "sell" the other Pharmacies—to straw purchasers who were Pharms employees—with the intent to deceive the PBMs and ensure that the Pharmacies could continue billing for expensive compounded and other drugs.

39. The Pharmacies submitted claims to government and commercial health care benefit programs, generally through the PBMs, seeking reimbursement for the expensive compounded and prescription drugs they purportedly dispensed. Those health care benefit programs, in turn, reimbursed the Pharmacies' claims in reliance on the representations made by **LEONARD CARR**, Owner 1, Owner 2, Physician 1, and others that the drugs dispensed were medically necessary, based on valid prescriptions, not induced by kickbacks or bribes, dispensed in accordance with state licensing requirements, and that copayments were properly collected.

40. Between in or around 2013 and in or around 2017, government and commercial health care benefit programs paid the Pharmacies, generally through the PBMs, well over approximately $200 million, mostly for compounded and prescription drugs that were medically unnecessary, based on an invalid prescriber–patient relationship, induced by kickbacks or bribes, dispensed in violation of state licensing requirements, or for which copayments were not collected. Between in or around 2014 and in or around 2017, **LEONARD CARR** was paid at least $2.8 million from his ownership in and employment for Pharms and the Pharmacies.

### Overt Acts

41. In furtherance of the conspiracy, and to accomplish its object and purpose, **LEONARD CARR** and his coconspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas and elsewhere, the following overt acts:

   a. Owner 1 and other Sales Representatives referred themselves and their

10

families, friends, and acquaintances to receive compounded drugs that were often medically unnecessary, based on invalid prescriptions, dispensed in violation of state licensing requirements, and for which copayments were not collected.

b. Some of the individuals referred lived in Ohio and states other than Texas in which the Pharmacies were, at the time, unlicensed to dispense compounded medications.

c. Although Physician 1 purportedly prescribed expensive compounded drugs to many of these Sales Representatives, their families, friends, and acquaintances, Physician 1 never saw or treated as patients these individuals, many of whom resided in different states in which Physician 1 was not licensed to practice medicine.

d. Owner 1 and other Sales Representatives were paid commissions on a monthly basis on these prescriptions for which the PBMs reimbursed the Pharmacies, even though Owner 1 and Sales Representatives knew that these prescriptions were fraudulent.

e. In or around December 2014, Pharms, LLC paid a company owned by Owner 1 approximately $506,510.31 for "Sales Commissions for November 2014" by check from JPMorgan Chase Account ending *1228. **LEONARD CARR**, a signatory on the account, signed that check. The payment included commissions based on prescriptions for known Sales Representatives, and other out-of-state individuals who resided in states in which the Pharmacies were unlicensed.

f. **LEONARD CARR**, Owner 2, and others signed off on other sales commission checks paid to Owner 1 and other Sales Representatives and their associated entities to induce prescription referrals for compounded and other drugs that would be paid for by government health care benefits, including Medicare and TRICARE.

g. Some of the payments were concealed to make it appear as if they were not being made in violation of the Anti-Kickback Statute.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

42. Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the defendant **LEONARD CARR** that, upon conviction of Count One, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense is subject to forfeiture.

### Money Judgment and Substitute Assets

43. Defendant **LEONARD CARR** is notified that upon conviction, a money judgment may be imposed against the defendant. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of each defendant up to the amount of the money judgment.

RYAN K. PATRICK
UNITED STATES ATTORNEY

ALLAN MEDINA
ACTING DEPUTY CHIEF
HEALTH CARE FRAUD UNIT
U.S. DEPARTMENT OF JUSTICE

ALEZA REMIS
Assistant Deputy Chief
DEVON HELFMEYER
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
1000 Louisiana, St. 2300
Houston, Texas 77002
Aleza.remis@usdoj.gov
(713) 567-9406